CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 2023-03735　　　　　　　　　　DIVISION: D　　SECTION 6

FILED 2023 APR 26 AM 10:41 CIVIL DISTRICT COURT

JANICE H. BAELE, ET AL

VERSUS

UNIVERSITY HEALTHCARE SYSTEM, L.C. D/B/A
TULANE MEDICAL CENTER, ET AL

---

### PETITION FOR DAMAGES

NOW INTO COURT, come plaintiffs, Janice H. Baele, Nicholas Baele, Dana Baele and Mark Baele, all competent majors domiciled as follows: Janice H. Baele domiciled in Indianapolis, State of Indiana; Nicholas Baele domiciled in Chicago, Illinois; Dana Baele domiciled in in Indianapolis, Marion County, Indiana; and Mark Baele, domiciled in Longmont, Colorado, who respectfully represent:

1.

Made defendants herein are:

A. University Healthcare System, L.C. d/b/a Tulane Medical Center, a Louisiana limited liability company doing business in the Parish of Orleans, State of Louisiana; and

B. Stephen Mallernee, M.D., a person of full age of majority, believed to be domiciled in the Parish of Terrebonne, State of Louisiana.

2.

Janice H. Baele is the surviving spouse of Joseph R. Baele, M.D., and Nicholas Baele, Dana Baele and Mark Baele are the biological children born of the marriage of Janice H. Baele and Joseph R. Baele, and as such, are entitled to bring this claim individually and on behalf of her deceased husband, Joseph R. Baele, M.D.

3.

On September 24, 2021, at 5:04 p.m., Joseph Baele presented to the emergency department at Tulane Medical Center in New Orleans, Louisiana, via New Orleans EMS, with complaints of two to three hours of substernal chest pain with inspiration, thoracic back pain, history of smoking and first-degree family history of thoracic aortic aneurysm. Dr. Baele had taken 324 mg of aspirin prior to arrival at the emergency department, with little relief of his pain. The EMS report indicates Dr. Baele also complained of epigastric pain during transport.

4.

1



At approximately 5:14 p.m., Dr. Baele was triaged by Sarah Sixbey. There was no mention in Ms. Sixbey triage assessment about whether Dr. Baele smoked, and Ms. Sixbey noted that Dr. Baele's pain rating was 0/10, which was inaccurate. Dr. Baele rated his pain at 6/10 during the EMS transport. There is no mention in Ms. Sixbey's assessment of Dr. Baele's complaint of thoracic back pain, his first degree family history of thoracic aortic aneurysm, or his history of tortuous aorta. Ms. Sixbey's assessment erroneously indicates Dr. Baele's onset of pain was 5:17 p.m. and Dr. Baele's blood pressure at the time of triage was 140/80 (hypertensive). Ms. Sixbey erroneously triaged Dr. Baele as an Emergency Severity Index level of 3.

5.

At approximately 5:17 p.m., Dr. Baele was evaluated by emergency medicine physician Dr. Stephen Mallernee. Dr. Mallernee noted that Dr. Baele had substernal chest pain and lower thoracic back pain. The pain was exacerbated by deep breathing and relieved by nothing. Dr. Mallernee also noted Dr. Baele's history of tortuous aorta and risk factors included a positive first degree family history and smoking. Dr. Mallernee assessed Dr. Baele's heart score for MACE at 5 (moderate risk 12%-16.6%).

6.

At 5:17 p.m., Dr. Mallernee ordered an EKG to be done "now", laboratory testing, a cardiac monitor[1], an ISTAT troponin level[2], saline lock x 2[3], 0.4 mg of nitroglycerin every five minutes as needed for chest pain[4] and a chest x-ray. The EKG was not completed until 5:50 p.m., despite the fact Dr. Mallernee ordered the EKG to be done "now." The EKG showed sinus bradycardia (a normal variant for Dr. Baele per his medical history), nonspecific T wave abnormality, no acute ischemic change and **no STEMI**.[5] The chest x-ray was not completed until 6:12 p.m., nearly an hour after the order was placed by Dr. Mallernee. The virtual/remote radiologist didn't result the chest x-ray until 6:53 p.m. and negligently noted there were no acute concerning abnormalities.

---

[1] The cardiac monitor was not placed until 6:38 p.m.
[2] It is unclear from the records whether the ISTAT troponin level was completed. The only troponin level is reported in the 6:28 p.m. lab draw. Dr. Mallernee's 5:17 p.m. order for the ISTAT troponin notes the order was "logged and in process" by the lab at 6:40 p.m.
[3] There is no evidence in the record that the two IVs were placed. It is known that one IV was placed because it was noted in the Code Blue document that the IV was infiltrated when Dr. Baele coded and had to be placed again.
[4] The first dose of nitroglycerin was not given until 6:39 p.m. and a second dose was administered at 6:45 p.m. Neither dose provided relief of Dr. Baele's chest pain.
[5] Dr. Mallernee's order for the 12-lead electrocardiogram was issued at 5:17 p.m. and Dr. Mallernee ordered that the electrocardiogram be done "Now. Repeat at 30 minutes, repeat at 1 hour, repeat at 3rd hour." The EKG wasn't done until 5:50 p.m. Had the EKG and the ISTAT troponin level been done immediately as ordered, cardiac etiology could have been ruled out immediately.

2

The labs were not drawn until 6:28 p.m., and the results were not returned until 7:14 p.m., two hours after Dr. Baele arrived at the emergency department. Per the lab report, Dr. Baele's white blood cell count was 15 and his troponin test was negative[6], indicating his pain was not cardiac in origin. Dr. Baele was given the first dose of 0.4 mg nitroglycerin[7] at 6:39 p.m. (over an hour after the order was given) and a second dose at 6:45 p.m., with no relief of his pain. Not even one of Dr. Mallernee's 5:17 p.m. orders was carried out in a timely fashion or with any urgency, despite the fact Dr. Baele presented to the Tulane Medical Center, with classic signs and symptoms of an aortic aneurysm.

7.

Dr. Mallernee noted the chest x-ray revealed a widened mediastinum, which is indicative of, among other things, an aortic aneurysm. **The finding of a widened mediastinum was not reported by the radiologist**. In light of the widened mediastinum, Dr. Baele's history of smoking and his first degree familial history of thoracic aortic aneurysm in his mother, Dr. Mallernee wanted to proceed with a CT angiogram of the chest, but he negligently elected to wait until the return of the blood work (creatinine level at 7:14 p.m.) before ordering the CT angiogram at 7:17 p.m., a full hour after the chest x-ray revealed the widened mediastinum and two hours after Dr. Baele had arrived in the ED. An aortic dissection should have been suspected and waiting for the creatinine delayed the diagnosis. *"Renal function testing may be bypassed if medical acuity of patient warrants immediate contrast enhanced CT imaging (example- code stroke CTA, potential acute aortic dissection, Level 1 trauma, etc.," (source: Yale School of Medicine, CT Policy Regarding Contrast-Associated Acute Kidney Injury)*

8.

It is believed the CT angiogram of the chest was not completed until approximately 8:18 p.m., an hour after it was ordered, two hours after the chest x-ray showed the widened mediastinum and now three hours after Dr. Baele's arrival at the ED.

9.

The CT angiogram revealed a Type A aortic dissection, a life threatening and emergent medical condition. The CT angiogram was not resulted and reported by the radiologist until 9:42

---

[6] Dr. Mallernee ordered the Tropinin level ISAT POC at 5:17 p.m. The blood draw wasn't done until 6:28 p.m. and resulted at 7:14 p.m. Dr. Mallernee's order indicated, "This is the lab order for Troponin. Please order the Trop – ISTAT"

[7] Dr. Mallernee ordered 0.4 mg of nitroglycerin at 5:17 p.m., to be administered every five minutes for chest pain x 3 doses. The first dose of nitroglycerin was not given until 6:39 p.m.

p.m., nearly 90 minutes after the CT angiogram was completed. However, it is believed Dr. Mallernee reviewed the CT angiogram in real time as it populated at 8:20 p.m., noting the dissection.

10.

The medical record is unclear and contradictory as to the timeline of events that took place after the CT angiogram and the discovery of the emergent Type A aortic dissection. Dr. Baele underwent a cardiothoracic surgery consultation performed by resident Dr. Alexandros Flaris at a time which is unclear from the medical records. It is believed the cardiothoracic surgery consult was ordered at 8:42 p.m. by Dr. Kotler, who took over for Dr. Mallernee. This would have been 22 minutes after the discovery of the aortic dissection. Dr. Kotler ordered that the consultation take place at the time of the order. Dr. Flaris, while noting Dr. Baele was "in no acute distress," diagnosed Dr. Baele with the Type A dissection and planned for a sternotomy, aortic arch replacement with graft, possible aortic valve replacement and possible coronary bypass. There is no mention in Dr. Flaris's consultation note of the urgency of the condition and the need for emergent surgery. The surgery was to be performed by Dr. Eugene Kukuy. Dr. Kukuy never saw Dr. Baele. In fact, the only mention of Dr. Kukuy in the medical record is when Dr. Kukuy attested to the findings and plan contained in the cardiothoracic surgery consultation performed by Dr. Flaris the next day at 9:58 a.m.

11.

Dr. Baele also underwent a cardiology consultation by cardiology fellow Dr. Edgar Acuna Morin at a time that is also not clear in the record.[8] Contrary to what Dr. Flaris noted in his consultation note, Dr. Morin noted Dr. Baele was "in distress." He also noted that cardiothoracic surgery was planning to do a surgical management "now." Dr. Morin further noted that "patient was hypertensive in the ED and given chronic bradycardia, beta blockers are contraindicated, but other vasodilators without AV nodal effects could be used as medical management before a surgical intervention today. An ascending aortic dissection is an emergent condition, ideally should be treated surgically as soon as possible given imminent risk of complications." Dr. Baele

---

[8] There is no indication in the record who ordered the cardiology consult, when the cardiology consult was ordered, or when it was performed, and the defendant Tulane Medical Center admitted in its submission to the MRP that "the specific encounter time of the cardiology consult is unknown from the record."

4

was never given any medication whatsoever to control his high blood pressure and his blood pressure was only checked four times during his entire 5+ hours in the ED. It is believed and widely documented that the extra force of high blood pressure pushes against the walls of the aneurysm causing it to expand. It is questionable whether a cardiology consult was warranted for an emergent case such as Dr. Baele's, wasting precious time and delaying emergent intervention.

12.

At 9:09 p.m., Dr. Baele signed the consents for surgery. According to the record, Dr. Baele was added to the OR schedule at 9:24 p.m. However, there are three add on cases listed on the OR schedule timed at 9:45 p.m. that appear before the entry for Dr. Baele at 9:24 p.m. At 9:30 p.m., over two hours after the CT angiogram was ordered and more than an hour after the CT angiogram revealed the Type A aortic dissection, the staff began calling the on-call OR staff members to report for the surgery. The fourth on-call RN call was not reached until 9:41 p.m. The anesthesiologist was not contacted until 9:35 p.m. The on-call OR staff members are given 30 minutes to arrive. The final on-call OR staff member didn't arrive at the hospital until 10:01 p.m., now 120 minutes after the Type A aortic dissection was identified on the CT angiogram and 5 hours after Dr. Baele arrived at the ED. The OR should have been alerted as soon as Dr. Mallernee viewed the CT angiogram and identified the dissection at 8:20 p.m. There were no proactive measures taken to prepare the operating room and this caused a major delay in caring for this life-threatening condition.

13.

Operative orders such as blood type and screen, packed cells and fresh frozen plasma were placed by Dr. Caleb Fligor, general surgery resident, at 9:41 p.m., arguably one full hour after the cardiothoracic surgery consultation, and those orders were **never completed**, indicating surgery was not imminent.

14.

At 10:14 p.m., Dr. Baele was **found** alone in his ED room, difficult to arise (sic), with mottled skin and no pulse. CPR was not started for four minutes after he was found unresponsive. He was intubated at 10:19. He was given 1MG of epi at 10:20, but it was noted the IV to the right AC was infiltrated. Thus, another IV was placed at 22:23.[9] Life-saving efforts were unsuccessful, and Dr. Baele was pronounced deceased at 10:28 p.m. on September 24, 2021. At 22:33:45

---

[9] Further proof that the two IV lines were not placed as ordered by Dr. Mallernee 5:17 p.m.

5

(10:33:45 p.m.), five minutes after Dr. Baele was pronounced deceased, a bedside ECG revealed cardiac activity and a blood pressure of 155/71. Dr. Baele was still wearing his street clothes when he died. Dr. Baele was not ready for surgery at the time of his death. He was not in a hospital gown despite being in the ED for over 5 hours. And he did not have a patent IV line going into an extensive surgery. The medical record is unclear as to whether or not Dr. Baele was on a cardiac monitor at the time of his death.

15.

Dr. Stephen Mallernee and University Healthcare System, L.C. d/b/a Tulane Medical Center, and/or their nurses, staff, employees, and others for whom they are responsible were negligent, at fault and breached the standard of care in the following non-exclusive particulars:

A. Failure to rapidly and properly evaluate Joseph R. Baele.

B. Failing to provide proper medical treatment to Joseph R. Baele.

C. Failure to provide timely medical treatment to Joseph R. Baele.

D. Failure to recognize and communicate the severity of Joseph R. Baele's medical condition.

E. Failure to properly monitor Joseph R. Baele's medical condition.

F. Other acts of negligence and/or malpractice to be shown after discovery.

16.

The breaches in the standard of care by defendants caused the death of Joseph R. Baele, M.D., or at the very least, caused a loss of a chance of survival and/or better outcome of Joseph R. Baele, M.D. Accordingly, Janice H. Baele, Nicholas Baele, Dana Baele, and Mark Baele assert claims for loss of a chance of survival and/or better outcome of Joseph R. Baele, M.D.

17.

Janice H. Baele, Nicholas Baele, Dana Baele, and Mark Baele assert "survival actions" for the physical and emotional pain and suffering endured by Joseph R. Baele, M.D. during the incident and thereafter up until his death.

18.

Janice H. Baele, Nicholas Baele, Dana Baele, and Mark Baele also assert wrongful death actions for the damages they sustained as a result of the death of Joseph R. Baele, M.D, including but not limited to the following damages, as are reasonable in the premises:

   a) Loss of love and affection;

      b) Mental anguish, grief and suffering;

      c) Medical expenses;

      d) Funeral expenses; and

      e) Other damages to be shown at trial.

Plaintiff, Janice H. Baele, is the wife of Joseph R. Baele, and as such, asserts a cause of action for loss of consortium in an amount reasonable in the premises.

19.

The medical review panel met pursuant to the law and issued an opinion with respect to Tulane Medical Center and Stephen Mallernee, M.D. Plaintiff's attorney was notified of the medical review panel opinion, via certified mail, on January 27, 2023.

WHEREFORE, plaintiffs pray that the defendants be duly served and cited to appear and answer this Petition for Damages and that all after due proceedings are had, that there be judgment in favor of plaintiffs and against defendants in a reasonable amount in the premises, plus legal interest thereon from the date of the judicial demand until paid, for reimbursement of all costs incurred in the prosecution of this claim and all other general and equitable relief as allowed by law.

_____
Janice H. Baele, Plaintiff
5867 Lake Kessler Court
Indianapolis, Indiana 46226
(317) 405-7306

_____
Nicholas Baele, Plaintiff
919 N. Hermitage Avenue
Chicago, Illinois 60622

_____
Dana Baele, Plaintiff
6008 Ralston Avenue
Indianapolis, Indiana 46220

_____
Mark Baele, Plaintiff
1349 Missouri Avenue
Longmont, Colorado 80501

7

**PLEASE SERVE:**

UNIVERSITY HEALTHCARE SYSTEM, L.C. D/B/A TULANE MEDICAL CENTER
Through its Registered Agent
Jody Martin
1100 Poydras Street, Suite 2500
New Orleans, LA 70163

AND

STEPHEN MALLERNEE, M.D.
300 Wellington Drive
Houma, LA 70360

8